The next case is 20-30810, Liberty Insurance Underwriters Incorporated v. LaBarre. Victor Marcello, may it please the Court, Your Honors. The issue here is simply whether or not summary judgment should have been granted in light of the requirement that extrinsic evidence be looked at. There's definite conflict in the extrinsic evidence in the record, and procedurally, summary judgment should not have been granted. This is a rather complicated case in terms of the agreements and the way they're structured. Basically, what you have is two agreements. This case arises out of the sinkhole in Assumption Parish, Louisiana, pretty nationally publicized back in 2012. And we represent that the LaBarres were the adjacent property owners, although they did represent, I think, they had about 10 acres of the property that was in the sinkhole itself. The case progressed for a long time. Liberty was sued under the Direct Action Statute. Liberty Mutual was sued under the Direct Action Statute. There were three principal defendants, Oxy, Occidental, and Vulcan Chemicals, and Texas Brine, which actually operated the well on the sinkhole itself. When it came time to settle with Texas Brine and with Liberty, two documents were signed. The first document was this settlement agreement. And in the settlement agreement, there were three specific places, three paragraphs, pretty much overkill, where the LaBarres, the plaintiffs, there were actually three groups of plaintiffs. I'll just call them collectively the LaBarres. The LaBarres reserved their rights, clearly, to proceed against the insurance, collectible coverage, for the pre-2012 insurers. The sinkhole happened in 2012, and there were two theories of liability and damages that were set forth in the petition. The first was actually the damage caused by the sinkhole itself, and there was another theory about what had happened in the years prior to the sinkhole. There was subsidence. Subsidence was the basic issue in the pre-2012 allegations. The pre-2012 insurers refused, at the time of the settlement with Liberty, which was in, Liberty was in the 2012 Tower of Insurance, actually the sinkhole occurrence tower that year. The pre-2012 insurers refused to participate, and so the settlement was mainly, was with only the insurance and for the sinkhole event itself in 2012. In the settlement agreement, in paragraphs one, three, and five, the plaintiffs explicitly reserved their rights to go against the pre-2012 insurers. Under the Louisiana Direct Action Statute, you can settle with an insured and his insurer and reserve your rights to either excess coverage or other coverages, as long as you do it under what's called the Gasquet Settlement, where what you do is you reserve your right to the extent of collectible coverage. That's what happened here. And so there was a settlement agreement, and then there was a separate agreement. And so the settlement agreement did several things. It released Liberty, and it expressly reserved the rights of the plaintiffs to go against the pre-2012 insurers. It contained, and then after the settlement agreement was confected, there was a separate agreement called the Tripartite Agreement. And the reason there was a Tripartite Agreement that was not in the settlement agreement is that Texas Brine itself, which was the insurer of Liberty, refused to participate in that agreement. It was solely a settlement. The settlement agreement was between the plaintiffs and Liberty. Texas Brine did not want to participate. And so there was a separate agreement confected after that. And the second agreement specifically says it was a separate agreement. It involved three parties, not two parties. Texas Brine participated in that agreement. And in that agreement, what happened was Liberty was assigned its rights to the plaintiffs, and Texas Brine signed its rights to proceed against the pre-2012 insurers. That's all it did. If you look at the controlling language, it's the introductory paragraph in that agreement. And in the introductory paragraph, it says very explicitly that this is an agreement involving the assignment of Liberty's rights. It's called LIUI. It's Liberty Insurance Company. That's all it does. It does not do anything else. Liberty paid the full amount of its coverage. It had $45 million in coverage. It paid the full amount of its coverage. And there was a lot more. There were a lot of cases, a lot of claims that arose under this event. And so there was a lot of insurance above Liberty, and Liberty was concerned about drop-down and what would happen. But basically what was worked out is what you see in the tripartite agreement. Is that agreement ambiguous or straightforward? I think the tripartite agreement, the way it was interpreted by the trial court, is ambiguous. What happened in the trial court is both parties said it was unambiguous. The plaintiffs said it was unambiguous because the introductory paragraph said it only involved the assigned rights. So you're saying it's ambiguous because plaintiffs said A, you said B, and court said A. It is ambiguous. It's ambiguous because you don't like what the court said. No, not really. Because it could be ambiguous for many reasons. But what you have is you have two clauses, one of which the plaintiff says is unambiguous, one of which the defendants say is unambiguous. And these clauses are conflicting, which gives rise to ambiguity. Stop right there, counsel. Which clauses are conflicting in the tripartite agreement? In the tripartite agreement, what happens is in the introductory paragraph it says this is an agreement regarding the assignment of LIUI's rights. Enter into the following agreement regarding the assignment of LIUI's rights. Right. And so that, we believe, defines the scope of the agreement. That's it. It defines the scope. Well, it just says it regards the assignment of LIUI's rights, which I guess is drawn from the settlement agreement, correct? No. All right. Well, tell me how we get to an ambiguity then. Well, specifically paragraph one, I mean, just cut to the chase, it sets out a payment scheme based on the amounts that the plaintiffs, if any, collect after the entry of the tripartite agreement, correct? I mean, in other words, against the pre-2012 insurers. Right. How is paragraph one ambiguous in the way it sets out when the plaintiffs are to pay and what sums they're to pay? If you look at it from, I can look at it from two viewpoints. The way we argued it, the plaintiffs argued it initially was that it was not ambiguous because it does say it deals with the rights that are assigned and it sets out how much is being paid if we collect, if the plaintiffs collect on those rights. But Liberty has interpreted the provisions of 1A, B, and C, the actual remittance procedures, as an agreement to give it part of the claims that the plaintiffs reserved in the settlement agreement, which are nowhere defined in the tripartite agreement. But the reason they say that is because that's what it says. It doesn't say that. It doesn't say what you say it says. There's no way, there is no place in the tripartite agreement that defines the reserved claims against the pre-2012 insurers. Nowhere. Nowhere does it say that. It just says plaintiffs will remit the first five million received from AIG, Zurich-related entities, and or other pre-2012 insurers to LIUI within seven days of receipt. It says that. It does say that. But it doesn't say with regard to recovery on the assigned claims that LIUI. It didn't have to. It didn't have to because the introductory paragraph says the agreement is about the assignment and it's nothing to do with the settlement agreement. But it says it's regarding the assignment, so how is that not just consideration for the plaintiffs getting assigned Liberty's claims? It's not consideration because the consideration is nowhere mentioned in here. What the argument is really is that you have a settlement agreement. Look at the context. You have a settlement agreement where three times in three separate paragraphs the plaintiff's claims against the pre-2012 insurers are expressly reserved. Well, sure, because you're cutting Liberty loose. Yes. That's just what happens when you settle a multiple defendant case with one defendant. But one agreement has nothing to do with the other agreement. There's no definition of the reserve claims. Call them whatever you want, subsidence claims, reserve claims. There is no reference to that anywhere, a definition of it in the tripartite agreement. But, counsel, doesn't that just mean, I mean, it kind of supports Liberty's argument, doesn't it, that that just means that if the plaintiffs recover five million, period, they pay the first five million to Liberty? If you read it literally, that's how they read it literally. But why wouldn't we read it literally if it's an unambiguous contract? Well, because you have to look at it in the context of what it says right above it, that this is what the agreement is about. Besides all this, does it actually matter to the trial court's judgment because of Louisiana law? In my understanding, and we cite the case of Brown v. Drillers, okay, if you're going to consider these two agreements together, and there's no reason to do that because it says it's a separate agreement. When it says it's a separate agreement, that means it has nothing to do with the settlement agreement. This is all implied. The trial judge implied that this somehow has something to do with the settlement agreement. But the settlement agreement aside, just the tripartite agreement, if it's unambiguous. If you're going to consider the tripartite agreement as part of the deal, okay, to pay them their money back, that's a reference back to the settlement agreement because they're a settlement agreement. But put it aside, counsel. Put it aside. Just the terms of paragraph one of this tripartite agreement, it says the plaintiffs will omit the first five million. But you're looking at one clause in the contract to the exclusion of the introductory clause, which Louisiana law says you can't do. I'm not excluding it. It's in regarding to the assignment of LIUI's rights. The beginning of paragraph one says in exchange for the transfer of those rights, the assigned claims, the plaintiffs agree to the following, basically. How is that not consideration? The consideration is that Liberty, which, you know, eventually was unable to provide any basis that it had any rights. But leaving that aside, Liberty wanted to try to justify what it was paying, I guess with its client, and it wanted to try to get some money back. But it also didn't just want to do that. It said you plaintiffs, you go after our assigned claims, subrogation, offset, whatever those claims may be as against the other insurers. In other words, didn't Liberty just outsource what its rights would otherwise be if the plaintiffs had recovered $20 million? And what they got in exchange for that was they have a situation where they're having the plaintiffs in Assumption Parish, Louisiana, sponsoring their worthless claim. But you agree to it. What's that? You agree to it. We agree to it. But we agreed to it because we weren't giving up anything other than our work and our position. Counsel, respectfully, you were agreeing to it because they paid $45 million. There is nothing, there is not one thing in the tripartite agreement anywhere that says I did, we did that because they paid us $45 million. Real briefly, Counsel, I want to ask you about another topic if I can. This issue of extrinsic evidence under Louisiana law. Did plaintiffs not forfeit that by failing to raise it until their motion to reconsider? I'm sorry, Your Honor. The argument about extrinsic evidence under Louisiana law. That's what I wanted to get to. Is that not forfeited? Was it not raised too late? No, it wasn't. It was raised in your motion to reconsider, right? But it wasn't raised in the motion, it wasn't raised too late because of the fact that the way the judge decided the case, we thought it was unambiguous that the introductory paragraph covered everything. We don't waive that. As a matter of law, Louisiana law is very different. Texas law, as I understand it, is you have a heavy burden to prove mistake of fact in Texas law. In Louisiana, the Brown v. Drillers case says you can look at extrinsic evidence in a settlement agreement anytime there is a question of what the intent of the parties were. If there was a mistaken intent, we have a right to put on extrinsic evidence. But you never raised that argument prior to the motion to reconsider. You contended the contract was unambiguous. Then you contended that if it was ambiguous, you'd look to extrinsic evidence. But you never raised the provision of Louisiana law about settlement agreements in particular, correct? We didn't need to because we thought that the introductory paragraph settled the whole issue. Counsel, you saved some time for us. Yes, thank you. Good morning, Your Honors. Judy Barrasso for Liberty Insurance Underwriters, Inc. May it please the Court. This is really a simple case. It's an interpretation of a contract. Judge Wilson has been talking about the tripartite agreement. The district court twice in two decisions found that the tripartite agreement unambiguously obligates the labars, who are the defendants in this case. I think Mr. Marceau is a little bit talking about the other case. But the labars are unambiguously obligated to pay Liberty the first $5 million recovered from certain insurers and more if they recover more. And the court also said two or three times it did not consider extrinsic evidence. And in those decisions, which we believe are correct and should be affirmed, and we'll look at the agreements, there's no words in the agreement that in any way limit the recovery to the claims that they now allege are the only subject of the recovery. That agreement says the first $5 million goes to Liberty. So this is a very stupid question, and maybe I haven't studied this closely enough. I'm assuming that somebody did recover more than $5 million from the pre-2012 insurers. Yes, Your Honor. When the case started, the settlement had not been confected, but there was an attempt to do that. And some of the evidence that we did submit in case there was doubt talks about that and what was happening. As the case has gone on, there was a settlement, and it was more. And this is outside of the – I mean, it's in the record of the case. I think we asked for an injunction. Well, I just assumed that's why you're fighting over it. Yes, yes, yes. And rather than focus on the simple terms here, what the labars have done throughout is try to muddy the waters and create fact issues that don't exist and obfuscate. We've had flip-flop arguments. As Judge Wilson noted, initially they filed a motion to strike, argued viciously that you couldn't consider extrinsic evidence, and argued on reconsideration it was error for the court to consider extrinsic evidence, and the court said it didn't. And they argued here it was error to do it, but also that it must do it. So it's a little bit conflicting there. There's been allegations that have made up, as the court below noted, the whole notion of these different kind of claims, the subsidence claims, the signed claims. Nowhere is there any reference to that kind of distinction in the agreements or any other document offered to the court. It was contemporaneous. The only time it's mentioned is in an affidavit submitted by the attorney for the labars. And we urge the court to focus in resolving this issue by looking at the straightforward terms of this agreement, the tripartite agreement. And we don't need to look at the settlement agreement to do it, but you can. But you don't need to, because in this agreement it does reference the $45 million payment, although in the briefs it suggested that it doesn't, but it's in here, and it also referenced the settlement agreement. As a side point, if you know, if the judgment of the district court is affirmed and the $5 million or so has to be returned, is that going to come out of the pockets of the plaintiffs or is the settlement pot undistributed as to at least this amount? Judge, after the decision came down from the district court and then the settlement was affected and we asked to have the money held in escrow and then made a demand for payment, we've been paid, not in full. But we're still the dispute as to whether we think we're entitled to that money. Okay. And it's been paid. And, again, if we look at the agreement, and it's not just paragraph one, which we think clearly does set out the terms. And what's important in looking at the agreement is paragraph one is where the agreement actually starts. And this is true under Louisiana law. The introductory paragraph is not necessarily part of the agreement. And we cited cases, the McCary case, U.S. environmental case, which address this very issue. The introductory clause, the whereas clauses have lots of things sometimes in there. But you get to the meat of the agreement when it says the parties agree to the following. Well, counsel, if we consider the preamble or the introductory paragraph, does that create an ambiguity, as counsel opposite says? It does not. I mean, it is correct that this agreement regards the assignment of rights. It also regards, and if you look at paragraph four, there's a more robust description of what the agreement involves. It involves assignments. It involves payment provisions in paragraph one. And it involves a sharing agreement in paragraph three. And in paragraph four, when they're talking about all the things that are involved here, and it says all of those are limited solely to the recoveries from the Texas party's pre-2012 insurers and does not include and then sets out things that are excluded. But what's missing from the excluded part is what they're arguing now. Nowhere in here says this recovery doesn't include our newly termed subsidence claims or that it just involves the assigned claims. That's nowhere in here. And we also, the district court in our arguments are in step with the Louisiana Rules of Contract Interpretation, which are like most states. First, you look at the words of the agreement. And that's what we've done, and that's what the district court did. And you don't have to write in words to come out with our interpretation. As the court said in reaching that conclusion that our interpretation was the only reasonable one, the words they're seizing upon now just aren't in this agreement. And again, we also look at paragraph three. And here again, this is a division of the proceeds between plaintiffs and Texas Brine. And again, it says any amounts recovered from the Texas Brine pre-2012 insurers will be divided. In reading this with paragraph one, they're in sync because this division starts above $5 million. And that's because the $5 million is being given to Liberty in paragraph 1A. So both of those paragraphs are referencing any amounts recovered from the insurers. And here's what we're doing from them. And the other thing that's important is that if you look at paragraph five, Liberty also not only was assigning rights, it was agreeing that it wouldn't recover anything else from any other party or insurer, not just the pre-2012 insurers, but any of the other co-defendants, any of the other tort feasors. We were giving all our rights up in exchange for this settlement and this agreement. They would pay us back these monies. In the court, in interpreting the contract, noted that, again, the words that they seize upon are not in the agreement. The court also noted that their interpretation renders provisions meaningless, which, if that happens under Louisiana law, it's just not a reasonable interpretation as a matter of law. And this court found that proposition to be correct in the Richard Anadarto case. And here, under their interpretation, they're reading out the provisions that specifically limit recoveries to things other than what they claim now. And the court noted that, although they're arguing there's this limitation on what's subject to the agreement, those limitations are just not in this agreement. And if you look at paragraph four and paragraph eight, two times the agreement says this sharing agreement, this payment provision isn't limited solely to the recoveries from the insurers and does not include recoveries from other parties for Texas Brines' reimbursement of defense costs or recoveries from other parties. But, again, what's missing here is the argument Labar's make today, that it also doesn't include recoveries that Labar's make. Now, we've heard a lot today about the settlement agreement, which has been an inconsistent argument because, for a while, they were arguing the district court erred in even referring to the settlement agreement. And we believe you interpret the tripartite agreement on its own, but if you look at the settlement agreement, it doesn't change anything. And they cite to their reservation of rights. And, Judge Wilson, you're correct. Under Louisiana law, when you're releasing your rights and you're retaining them against other insurers under the Gasquet settlement, you need to be specific that you're reserving your rights that they already had and were already pursuing against the insurers. And that's all that happened in that agreement. And those were the rights that we were to be paid out of. Those claims were already ongoing, and they were just going to pursue them and pay us because those insurers wouldn't come to the table. I mean, Counsel, they were getting a benefit because Liberty was assigning any rights it would have had to hold up settlement amounts for subrogation, for any kind of dispute as far as recovery or anything like that. So, effectively, this also streamlined whatever settlement process happened later, right? Exactly right. Getting Liberty out of the way. And we were stepping – we wanted to be done with it. And we said, okay, you go forward against the other parties. You have your claims. They should have been at this table with us and paid part of it. They didn't. And then they agreed to pay us back what they got from those parties. I assume, since this was a class action, was it? No, it was a joint action. So it's not a class action. So the court didn't need to approve the settlement? No. Okay, just wondering. And there were multiple settlements along the way for the plaintiffs. I mean, our $45 million was the third one. They had more. Oh, my. Their primary argument in trying to find words in the agreement. They can all afford stilts now. What, ma'am? Their primary argument in trying to find words to support it is, again, the introductory paragraph, which under Louisiana law doesn't create the agreement. And we've cited cases that affects. And they also look at paragraph one, where it says, in exchange for the transfer of rights. And it also says, and the agreement by liberty not to pursue its other rights. And that is, again, that also doesn't create the obligation. We call it cause. I think other states call it consideration. But it doesn't define what the obligation is. And all that says is, this is part of the consideration. In the case we cite, Coffee Bay says under Louisiana law, you don't even have to put any of that in here. And it doesn't define anything. And, again, it doesn't change what the obligation here is. Now, I just want to address briefly the whole issue about the extrinsic evidence. The labars now argue, having worked hard below not to have extrinsic evidence considered, now saying the court must look at extrinsic evidence. And we agree that we think they've waived that argument anyway, because it wasn't raised until we got to the motion to reconsider. And it shouldn't be considered for that purpose. But in any event, there's no case or civil code article that says what's being argued here today. The Brown case does not say that you must consider extrinsic evidence when construing a settlement agreement, a compromise. And, in fact, in that case, they didn't. They didn't even reach extrinsic evidence. But they set out some principles to be considered when you're disputing the scope of a release, which is not the case here. We're not trying to figure out what a party released and whether they have other claims to assert. And that's what was going on in Brown. And the Brown court also said that in order to fall within this exception in determining the scope of a release, what a plaintiff may have given up to have the settlement, you also have to have, at that moment, substantiating evidence of a mistake in intent or not understanding what's gone on. And the bar's problem here is they don't have one piece of contemporaneous evidence that supports the position they've now taken. And so even if they somehow fit into Brown's exception, which they don't, they don't have any substantiating evidence to be considered that the court should even have to look at. But we submit, as in Brown and the other case they cite, Chalmette Retail, neither one of those courts looked at extrinsic evidence. They said, we're going to look at it from the four corners. And that's what the court below here did and did it properly. Now, we did offer extrinsic evidence if and only if there was any doubt about the interpretation. And Louisiana Civil Code Article 2053 provides for that situation. If, after you're interpreting a document, there's any doubt based on the four corners, then the court may consider evidence of what happened when you were negotiating, what happened before you were negotiating, and what happened after you were negotiating. And that's what we offered in the alternative. And we don't think in any way that that needs to be reached here because we think the tripartite agreement is plain and clear. But the evidence we submitted just further corroborates. There can be no question here. And the most telling piece of evidence is a document that's referred to as the original split document. I think we have that in your briefing. You do. All right. Thank you. And I'll just add one other thing on the extrinsic evidence is that they argue if you consider extrinsic evidence, it creates an issue of fact, and that's not necessarily true. You can have evidence presented, and there's no issue of fact. And we think that's the situation here. And this was a case, Judge Jones, I think you were on the Binewood case, where the evidence submitted was an after-the-fact affidavit by the attorney, which was not supported by any contemporaneous evidence. And the court there said, we're not considering that as to create an issue of fact. And that's the case here. The only evidence submitted was this after-the-fact affidavit of one of LaBar's lawyers, which are legal conclusions, legal arguments, and, again, not supported by one contemporaneous document. So we would urge you to look at the agreement and affirm the district court. Thank you. Thank you, counsel. Oh, excuse me. Okay. First of all, in terms of the introductory clause, this is not the introductory clause in this particular agreement. It's not a whereas clause. Those cases refer to whereas clauses. This is part of the agreement. Insofar as any waiver is concerned, if the court considers, would rule that there was a waiver by not raising the Brown v. Driller's case in the initial motion, in the initial opposition to the motion, you would, in effect, be saying that we should have predicted that the court would refer to evidence of the settlement agreement and what happened in the settlement agreement in confecting the tripartite agreement. There's no way we can predict that the court was going to do that. Mr. Marcello, did you participate in negotiating all of these settlements, I suppose? Not me personally, Your Honor. My partner did. Your partner did? Yeah. Obviously, these are brilliant settlements. They yielded tens of millions of dollars for your client, and now you're basically dancing away from what you entered into. And, frankly, this judge finds it very difficult to believe that such evidently brilliant lawyers don't believe the language they wrote. Well, again, Your Honor, I think if you read the tripartite agreement and stay in the four corners, you're not going to get where they want to go. So basically what the argument would be, and just bear with me, is that plaintiffs, what you should have done is insist in negotiating the tripartite agreement in addition to putting the introductory paragraph, which says the scope of this agreement basically is about regarding the assignment of LIUI's rights, and then you should have repeated that in paragraphs 1A, B, and C. We should have said in A, we should have said regarding the assignment of rights, this is how much money you get. We've already said it in the introductory paragraph. Why do we need to say it again? You also would not have said in paragraph 3 that plaintiffs and the Texas prime parties agree to divide as follows, any amounts recovered from the pre-2012 insurance, any amounts. And then when you flip over the next page, just a three-page agreement, right? Three or four, yeah, three pages. The very next page, it's for the amounts $5 million to $20 million, which kind of suggests that in paragraph 1, that first $5 million is also any amounts recovered. Your Honor. It's not my language. No, with all due respect, this is a tripartite agreement. Paragraph 3 says plaintiffs and the Texas prime parties agree to divide. It has nothing to do with liberty. Well, except liberty was agreeing to it also. No, that was an agreement. It was a tripartite agreement where two of the parties put in the agreement what was going to happen between themselves. That had nothing. By its own terms, it says it has nothing to do. That's how they've bent this agreement so out of shape that it's hardly recognizable. Then why did paragraph 3 start at $5 million and go to $20 million? Why did paragraph 3? Oh, you're talking about that's the agreement between Texas prime and the plaintiffs. And they carved out the first $5 million. Why did they do that? They carved out the first $5 million for amounts between 5 and 20, 55%. That was net amounts. That was intended to be net amounts to Texas prime and the plaintiffs. Why did they start at $5? Why did they start at $5? Because we don't get the first. You know, we have to give them the first. Plaintiffs will remit the first $5 million. Plaintiffs don't get that in 1A. But that's my point here, counsel, is that, I mean, that applies in paragraph 3 to any amounts recovered. And that first $5 million of any amounts recovered goes to Liberty. Yeah, it's any amounts recovered from the Texas. And agree that they're talking about amounts recovered for Texas prime and the plaintiffs. That's what that's referring to. It has nothing to do with Liberty. That's an agreement between Texas prime and the plaintiffs. Let me just say. That's what it says. Let me just suggest this one more time. It's not unusual for us to hear contract disputes where the lawyer is coming in and defending what his client signed before he was involved in the deal. It is unusual in a transaction of this magnitude and complexity for the law firm that wrote the deal to say that the deal doesn't say what it says as Judge Sterritt characterized it. So, you know, I'm very skeptical. The only thing I have to say to that is that there is an honest disagreement as to what the agreement actually says. Well, then you could always refund the $5 million to your clients if you screwed up. And they actually have the $5 million. We've transferred the $5 million to them already. Thank you, counsel. We have your argument. Oh, out of time. Thank you. That will conclude the arguments today. The court will be in recess until 9 o'clock in the morning. Thank you.